# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00638-CV

---

**C. Q., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 455TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-FM-24-000670, THE HONORABLE CATHERINE A. MAUZY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the trial court signed an order terminating the parental rights of C.Q. ("Mother") to her child "Eva."[1]  Mother challenges the legal and factual sufficiency of the evidence supporting (1) the trial court's findings that the Texas Department of Family and Protective Services (the Department) made reasonable efforts toward reunification, (2) its findings of statutory grounds for termination, and (3) its best-interest findings.  *See* Tex. Fam. Code §§ 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (O) (failing to comply with court-ordered family service plan),[2] (P) (used a controlled substance

---

[1]  We refer to appellant by her initials or as Mother, to the child by an alias, and to other individuals by their relationships to the child or Mother.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  In this case, the termination order also terminated Eva's Father's parental rights, but he has not appealed.

[2]  All references in this opinion to section 161 refer to the version of the statute in effect at the time of trial.  As of that date, Texas Family Code section 161.001(b)(1)(O) addressed

in a manner that endangers child), (b)(2) (best interest of child).  For the following reasons, we affirm the trial court's order.

## BACKGROUND

In February 2021, Mother gave birth to Eva, who tested positive for controlled substances and was removed from Mother's care for around three months.  Mother participated in a drug court program, obtained housing, and was able to keep Eva with her.

In March 2022, Mother received help furnishing her apartment from the family of L.S., a woman she met through a church program called Care Portal.  L.S. developed a friendly relationship with Mother and Eva, and in January 2023, Mother asked L.S. to care for Eva when Eva was again removed from Mother's care after Mother tested positive for drugs.  L.S. cared for Eva from mid-January through April 2023 while Mother completed services pursuant to a parent-child safety plan.  In August 2023, Mother was facing possible eviction from her apartment, so she asked L.S. to look after Eva, and Eva was in L.S.'s care for about ten days.

On September 18, 2023, the Department received a referral alleging that on the morning of September 11, 2023, Mother was observed leading Eva, then two years old, into their apartment building.  At that time, the temperature was between 85 and 87 degrees and Eva was barefoot.  The referral further alleged that Mother was seen leaving Eva inside the apartment while Mother briefly interacted with an unknown person in an unfamiliar vehicle, which the referring person suspected might have involved a drug transaction.  Based on this referral, the Department began an investigation and spoke to Mother, who admitted to recently having used

---

failure to comply with a court-ordered service plan.  The Texas legislature removed this ground for termination effective September 1, 2025, and renumbered subsequent grounds accordingly. Act of May 14, 2025, 89th Leg., R.S., ch. 211, § 2, 2025 Tex. Gen. Laws __ (codified at Tex. Fam. Code § 161.001).

2

cocaine while Eva was in daycare. Mother entered into a voluntary parent-child safety placement agreement with the Department. Mother suggested that L.S. might again be willing to provide care for Eva. As a result, Eva was placed with L.S.'s family beginning in September 2023. Mother was Eva's sole caregiver at the time of the referral because Eva's Father was incarcerated and was subject to a five-year protective order beginning in 2023 for violence against Mother and Eva; Mother also sought help from police multiple times after September 2023 seeking protection from Father after his release.

The Department offered services to Mother, including the option of participating in drug court, which she declined. Mother did not feel that drug court had been helpful during Eva's earlier removal, so the Department offered Mother other services and sought three times to have a family team meeting, but Mother did not participate in services, did not attend any family team meeting, and did not drug test. Mother's admission that she had used cocaine resulted in a finding of "Reason to Believe" that "abuse or neglect had occurred," and when Mother did not participate in services voluntarily under the parent-child safety plan, the Department filed for court-ordered services in October 2023. During the court-ordered services case, Mother was ordered to participate in random drug testing, to complete a substance-abuse assessment through an Outreach, Screening, Assessment, and Referral (OSAR) program, to participate in individual therapy, to "participate in protective parenting, and participate with a parent coach." Mother completed the OSAR evaluation in early December 2023, which recommended an intensive outpatient program. From October 2023 to January 2024, Mother did not submit to any requested drug test, did not begin the suggested outpatient program, did not complete an intake necessary to restart services with her therapist, and did not regularly participate in visits with her parenting coach.

3

Eva remained with L.S. until January 2024, when L.S. informed the Department that her family would no longer be available as a placement. At that point, without any other kinship or fictive kin placements available for Eva, the Department filed a suit affecting the parent-child relationship and obtained temporary managing conservatorship over Eva, who spent most of 2024 in three different foster placements.

Mother was homeless between January 2024 and June 2024 and did not fully engage in services. She was also stalked by Eva's Father following his release from incarceration in December 2023. Mother did not appear for most of the drug tests requested by the Department in the first half of 2024, though she did complete a urinalysis (UA) and hair follicle test in April 2024, both of which were positive for cocaine and marijuana. In June 2024, Mother left Austin to live with her sister in Killeen. She maintains that the day she left Austin in June 2024 is her sobriety date. From then on, she visited consistently with Eva, and all of her random UA screens, which averaged around four per week, were negative for drugs. In August 2024, Mother found a job, where she was still working nearly a year later at the time of trial. While living with her sister, Mother was permitted overnight visits with Eva from Friday through Monday. The Department's permanency goal remained reunification. But in November 2024, the Department received a hair follicle test from Mother that was positive for cocaine. Shortly thereafter, the Department moved visits back to the Department's office.

In December 2024, the Department contacted L.S. to see if her family would once again serve as a placement for Eva because the other short-term placements had not worked out—one had closed, one gave notice due to Eva's behaviors, and one was not willing to be a permanent placement. L.S. agreed, expressing that she wanted to be a foster-to-adopt placement. Meanwhile, Mother insisted that the positive hair follicle test was in error and requested further

4

hair follicle testing, including segmented hair testing. Although random UA screens continued to come back negative, subsequent hair tests in December 2024 and April 2025 came back positive for cocaine in all segments tested. In early 2025, Mother secured an apartment, which had a separate room for Eva. Mother shared that apartment with her fiancé, whom she had known for fifteen years. Although the fiancé provided information so that the Department could run a background check, which showed a criminal history from 2010 that involved "a history of substance use," he declined to participate in drug testing. As a result of the November and December positive hair follicle tests and other concerns, including that Mother's fiancé would not engage in drug testing, the Department changed its permanency goal in March 2025 from reunification to adoption. Frustrated with the hair follicle test results, Mother asked for a nail test, which came back negative for any drugs in May 2025.

During the four-day bench trial in July 2025, the Department and Eva's attorney ad litem asked the court to terminate Mother's parental rights; the CASA volunteer agreed that termination was in Eva's best interest. Evidence at trial reflected that Mother has struggled with substance abuse, homelessness, and domestic violence for much of her life. She has been diagnosed with Intellectual Development Disorder in addition to other mental disorders and has received limited formal education. She relocated to Austin from New Orleans after being displaced by Hurricane Katrina. Mother completed most aspects of her service plan, but not all of them. She went to therapy, parenting classes, and completed an intensive outpatient drug treatment program. Mother's therapist also testified that Mother believed her relationship with her fiancé was "not in her best interest," but she still had feelings for him. Mother did not attend therapy consistently at various times during Eva's removal, sometimes because homelessness left her with no private place to attend virtual sessions. Her therapist thought that therapy was not a

5

priority for her. She did not attend therapy between October 2024 and April 2025, and, although she worked on a relapse prevention plan, her therapist believed she did not put sufficient effort into that plan. Although Mother had previously completed OSAR programs, she did not complete a subsequent OSAR after these positive hair follicle tests, in contravention of the service plan's requirement that she do so after testing positive for drugs.

Mother argued that she had substantially complied with the Department's plan. She testified that living in Austin was one of the triggers that led her to continue using drugs, so once she left Austin and had stable housing with her sister, she stopped using drugs. She testified that as of the date of the trial, she had been working at the same job for almost a year, had an apartment for which she was paying, was willing to take her fiancé off of the lease and not live with him if the Department had concerns about him, had been sober since leaving Austin in June 2024, and had a work schedule that would allow her to take Eva to multiple days of therapy each week, after which she could drop Eva off at daycare or school, and Eva's aunt could provide care after daycare or school until Mother's shift ended. Other witnesses confirmed that Eva was bonded to Mother but said that visits with Mother upset Eva because Mother sometimes became so emotional during or near the end of visits that it was upsetting to Eva, though on their last visit together before trial, Mother demonstrated that she had learned how to help Eva transition away from visits by having Eva leave with the Department without becoming emotional until after Eva was out of sight. Testimony also showed that Mother had fallen asleep at some of the visits at the Department's office, did not reliably attend visits until June 2024, admitted to using cocaine while Eva was not in her care or was in daycare until June 2024, and had initially declined to participate in drug court because she felt it was unhelpful.

L.S. testified that while under her care, Eva was attending behavior therapy, play therapy, neurofeedback training therapy, and speech therapy each week to improve her negative behaviors of defiance and aggression. She explained Eva had been kicked out of more than one daycare for aggressive behavior while living with L.S., and, consequently, L.S.'s daughter was caring for Eva at home during the trial. L.S. explained that she was able to take Eva to work with her when daycare was not available. L.S. testified that she would be willing to continue as a placement for Eva only if Mother's parental rights were terminated and Eva could not have any contact with her mother. L.S. felt that Eva's interactions with her mother were not healthy even before she was taken from Mother's custody because Mother did not pay sufficient attention to Eva and instead spent time "with her phone scrolling TikTok." L.S. also testified regarding Mother's inappropriate interactions with Eva during FaceTime visits, stating that Mother was often naked and that during one FaceTime visit had panned the camera across her unclothed body while the man who is now Mother's fiancé was present with Mother. Although she did not specify concerns with Eva's other family members, L.S. testified that she would not allow Eva contact with other family members except possibly one of Mother's sisters and her children.

The trial court signed an order terminating Eva's parents' parental rights, finding by clear and convincing evidence that Mother had knowingly placed or knowingly allowed her child to remain in conditions or surroundings which endangered her physical or emotional well-being, that Mother had engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the child's physical or emotional well-being, that she had failed to comply with the court-ordered service plan, that she had used a controlled substance in a manner that endangered the child, and that termination of the parent-child relationship was in

7

the child's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P), (2). Mother appeals.

## STANDARD OF REVIEW

To terminate parental rights under Section 161.001, the Department has the burden to prove by clear and convincing evidence one of the statutory predicate grounds and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re R.R.A.*, 687 S.W.3d 269, 271 (Tex. 2024); *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024); *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *see In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018) ("Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection."). Parental rights have been characterized as "essential," "a basic civil right," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent."

8

*Holick*, 685 S.W.2d at 20. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.* In reviewing findings for factual sufficiency, we must give due deference to the factfinder's findings and cannot supplant the factfinder's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006) (per curiam); *see In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "sole arbiters of the credibility of the witnesses and the weight to give to their

9

testimony" and "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case"); *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that when reviewing termination order, appellate courts defer to "decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

## DISCUSSION

**The Department made reasonable efforts to reunify the child with Mother**

Mother asserts that the termination order does not comply with Texas Family Code subsections 161.001(f)(1) and (g), arguing that Department did not make reasonable efforts to administer the service plan and that the trial court's order failed to describe the Department's efforts with specificity in a separate section of its termination order. *See* Tex. Fam. Code § 161.001(f)(1), (g). Subsections 161.001(f) and (g) provide that:

> (f) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
> (1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent; . . .
>
> (g) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services in which the department made reasonable efforts to return the child to the child's home but a continuing danger in the home prevented the child's return, the court shall include in a separate section of its order written findings describing with specificity the reasonable efforts the department made to return the child to the child's home.

The order at issue provided:

The Court finds by clear and convincing evidence that Petitioner, the TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, made reasonable efforts to return the subject Child, [Eva] to Respondent Mother, [C.Q.], prior to the commencement of trial on the merits. The Court further finds that despite those reasonable efforts, a continuing danger remains in Respondent Mother, [C.Q.]'s home that prevents the return of the subject child to Respondent Mother, [C.Q.]. Texas Family Code §161.001(f)(1).

Specifically, the Court finds the Texas Department of Family and Protective Services made reasonable efforts to return the subject [child] by:

1. Contacting or attempting to contact various family members provided by [C.Q.] throughout the life of the case as possible placement for [Eva].

2. Meeting monthly with [C.Q.] to address services and needs that [C.Q.] might have.

3. Communicating daily over the phone for months at a time with [C.Q.].

4. Submitting multiple referrals for services and providers, throughout the life of the case, including parenting classes, individual therapy, psychological evaluation, OSAR, random drug testing in attempt to alleviate the concerns that brought [Eva] into the care of the Department.

5. Scheduling parent child visits regularly.

6. Communicating regularly with [C.Q.]'s individual therapist to receive updates on her progress.

7. Providing bus passes to [C.Q.] and/or providing transportation to drug tests, or transporting the child for visits.

8. By texting with [C.Q.] in addition to phone calls weekly or monthly.

9. By providing written pamphlets with resources for housing or employment.

10. By providing referrals to housing resources.

11. By communicating with [C.Q.]'s attorney if [C.Q.] could not be reached.

12. Meeting with [C.Q.] to complete a family strengths and needs assessment (FSNA) and completing a family plan of service to provide the necessary services needed to obtain the return of [Eva].

13. By running additional FINDRS searches for additional family of [C.Q.].

14. By providing the phone number to Integral Care for [C.Q.] to call about obtaining a bed for inpatient treatment that accepts her insurance.

15. By providing transportation for [C.Q.] to complete an in person OSAR evaluation.

16. By holding a family team meeting to discuss services and supports for [C.Q.].

17. By holding a permanency conference with [C.Q.].

TEX. FAM. CODE § 161.001(g).

Mother does not dispute the accuracy of the order insofar as it describes services provided to her, but she urges that the "Department's reliance on three positive hair follicle tests that took place after Appellant's completion of an IOP, while disregarding 31[3] negative UA tests and a negative nail test occurring during the same time frame undermines its claim that it made reasonable efforts to reunify the family." She observes that the Department offered no expert testimony that could help resolve the discrepancy in the outcomes of the tests. A witness for the Department testified that hair follicle tests for slower-growing hair could reflect a window for use that was longer than ninety days and that hair follicles bind drugs more strongly to darker hair. The evidence showed that nail testing could detect drugs used within the past six months, while urinalysis generally detects drugs used within two to three days. The record provides no explanation for the discrepancy between hair follicle tests and the UA and nail tests. Mother argues that by making no attempt to explain these differing results and instead concluding that the hair tests must be accurate, despite the possibility that Mother's dark hair may have impacted the results, the Department failed to show by clear and convincing evidence that it made reasonable efforts to reunify Mother and Eva.

---

[3] The Department acknowledges in its brief that Mother has had 44 negative urine tests since her purported sobriety date.

We disagree. The Department's unexplained reliance on the hair tests when dozens of UA tests showed different results does not mean that the Department did not engage in reasonable reunification efforts. The trial court was not required to give greater weight to the conflicting drug testing evidence than to the many other services the Department undisputedly offered to support reunification of the family. Viewed in a light favorable to the judgment, the evidence was legally sufficient for the factfinder to conclude that the Department made reasonable reunification efforts. The evidence was also factually sufficient to support the trial court's finding that the Department made reasonable efforts. Mother consistently disputed the accuracy of the hair tests, going so far as to request additional hair and nail testing to dispute what she alleges are inaccurate results. But the hair tests consistently came back positive. The manager of the lab that conducted some of the hair tests for the Department testified that darker hair would incorporate drugs more effectively than lighter colored hair, but not in a way that would create a false positive. The lab manager testified unequivocally that hair testing of darker hair did not lead to a greater incidence of false positives, stating "the drug usage creates the positive. We are only testing [what] was in the hair and reporting what is in there at that time."

Mother also argues that the trial court relied too heavily on the positive hair follicle tests in finding that a continuing danger existed in Mother's home. The Department's caseworker testified: "The goals of the case changed [from reunification to termination] because we consistently were getting positive test results, and both parents were not showing the Department that they were able to provide safe and stable housing or provide a safe environment for Eva to be in." In addition to having had a positive hair follicle test, Mother had also stopped attending therapy and did not take steps to complete another OSAR before the termination suit. And before the Department changed its goal from reunification to adoption, Mother had moved

13

in with her fiancé (who did not submit to drug testing) after describing her relationship as "not in her best interest." Considering the entirety of the record and weighing disputed evidence contrary to the finding against the evidence favoring the finding, the inconsistent drug test results were not so significant that the trial court could not reasonably have formed a firm belief or conviction that the Department's undisputed efforts to reunify Eva with Mother were reasonable and that a continuing danger remained in Mother's home. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also* Tex. Fam. Code § 101.007.

Mother argues that even if we conclude the Department's reunification efforts were reasonable, the order lacks sufficient specificity because it "does not address any of the measures [the Department] took to verify the incompatible drug tests." Mother is correct that the order does not speak to the issue of what the Department did to resolve the inconsistent drug test results; the record does not speak to how the tests might be reconciled and could therefore support no such finding. But the record does support the seventeen findings the trial court included in its order, and Mother does not dispute that those findings are sufficiently specific as to the matters contained therein. We therefore determine that the trial court's written findings described with sufficient specificity the reasonable efforts the Department made during the pendency of the termination suit to return the child to Mother.

We overrule Mother's first issue.

**The Department proved a statutory ground for termination**

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings of statutory grounds. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P). We limit our review to the trial court's findings against Mother that she knowingly placed or

14

knowingly allowed Eva to remain in conditions or surroundings which endangered the child's physical or emotional well-being, and that Mother engaged in conduct or knowingly placed Eva with persons who engaged in conduct which endangered the child's physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E); *In re R.R.A.*, 687 S.W.3d at 279 (reviewing termination under (D) and (E) grounds "because a finding of termination under those grounds may justify termination of parental rights to other children under subsection (M)"); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one statutory ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging termination under (D) and (E) grounds because of "due process concerns, coupled with the requirement for a meaningful appeal").

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury," the conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Id.* at *13–14; *see In re C.E.*, 687 S.W.3d at 310 (stating that (D) and (E) grounds "do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[] injury'" (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022))). "Conduct that subjects a child to a life of

uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 WL 5463861, at *4.

The relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *see In re C.E.*, 687 S.W.3d at 310 (stating that "termination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment"). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)." *V.P.*, 2020 WL 544797, at *4 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Under subsection (E), the inquiry is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied); *see In re C.E.*, 687 S.W.3d at 310 (stating that subsection (E) "requires that a parent's conduct endanger the child's physical or emotional well-being" but that "[p]roof that a parent specifically caused an injury is not necessary"). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262. Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See V.P.*, 2020 WL 544797, at *4 (citing *In re M.R.J.M.*, 280 S.W.3d at 503); *see also In re R.R.A.*, 687 S.W.3d at 280–81.

16

Mother forthrightly admitted her long history of addiction, which spanned more than two decades and continued for the first three years of Eva's life, during which time Eva was removed from Mother's care three times, including the removal that is the subject of this suit. Mother undisputedly continued to use drugs for nine months after Eva was removed. As a result of addiction, Mother's employment and housing were unstable until June 2024. Eva's therapist testified that her problematic behaviors, which included aggression toward other children that has caused her to be excluded from several daycares, were "due to the fact that she has insecure attachment and she is desperately looking for attachment and some consistency in her relationships [and] in her caregivers." Mother also demonstrated inappropriate behavior during visits with Eva, such as crying frequently, which upset Eva. Mother was sometimes observed talking on the phone with Eva's Father during visits, despite the existence of a protective order covering both Mother and Eva. L.S. testified that Mother would attend virtual visits with Eva while naked and at one point panned the camera across her unclothed body while the man who is now Mother's fiancé was present with Mother.

A parent's pattern of illegal use of a controlled substance supports a finding of endangerment under (D) and (E) when the evidence shows it adversely affected the parent's ability to parent. *In re R.R.A.*, 687 S.W.3d at 271. "When a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under (D) and (E)." *Id.*; *see In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of

17

conduct."). Although Mother was able to find stable employment and housing and maintains that she has been sober since June 2024, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346. Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Mother. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule her second issue without addressing the sufficiency of the evidence to support the (O) and (P) grounds. *See In re N.G.*, 577 S.W.3d at 232–33.

**The Department proved termination was in the child's best interest**

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding. *See* Tex. Fam. Code § 161.001(b)(2). Relevant factors in assessing the best interest of a child include (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide

18

the child with a safe environment"). These factors are not exhaustive, no one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

Some evidence in the record indicates that termination is not in the best interest of the child. The record shows that Eva was bonded to Mother and expressed frustration at being separated from her. Eva acted out when visits with Mother were decreased. For her part, Mother had contacted police repeatedly and obtained a protective order to keep herself and Eva safe from Eva's Father. Mother worked most of the services outlined in the Department's plan. She had completed an intensive outpatient drug program. She completed several parenting classes and was able to demonstrate some progress by her last visit with Eva before the trial by maintaining her composure and helping Eva transition away from the visit. She participated in therapy and learned to identify her triggers so that she could avoid relapsing. She moved away from Austin, which was a trigger for her, and found a stable job and housing, where she planned to provide a stable home for Eva. She had three overnight visits with Eva (supervised by Mother's sister) while living in Killeen, and the Department had no concerns for Eva's safety during these visits until they received the positive hair follicle test. Mother testified that because her job started later in the day, she would be able to take Eva to appointments and daycare. She testified that she had looked into daycare for Eva. She emphasizes that after June 2024, all of her

19

UA drug tests and the nail test were negative, and even though she was honest about past drug use (including during the initial exchange that led to the current removal), she contests the hair follicle test results—she was so confident in the inaccuracy of the first test that she asked for the two subsequent tests because she wants to show that she was no longer using and could provide a safe, stable home for Eva. A child psychologist testified that it would benefit Eva to maintain contact with her family of origin.

But evidence in the record also supports a finding that termination is in the child's best interest. As for the proposed placement, L.S. has provided care for Eva on and off since she was two years old. L.S. testified that, along with her husband and two children, they consider Eva part of the family. L.S.'s two grown children consider Eva to be like a sibling. Eva showed excitement when she was able to return to L.S.'s family after having moved to three other placements during 2024 and was excited to see their dogs. L.S.'s family is able to take Eva to various therapies four days a week, and they are able to care for Eva when daycare is not available. The CASA volunteer testified that Eva feels safe in L.S.'s home, was very comfortable there, and that L.S. remained calm while redirecting Eva's behaviors.

The CASA and caseworker observed that Mother's heightened emotions at visits upset Eva. Mother would cry during visits, and once, while visibly upset, asked Eva, "Do you love me?" Mother was observed to have fallen asleep during some visits at the Department; on one occasion, Eva attempted to wake her mother up to play with her. L.S. testified that Mother was naked during some virtual visits. For at least eight months after Eva was removed from the home, Mother was using cocaine and could not maintain housing or employment. Even after moving to Killeen, Mother sometimes contacted Eva's Father while visiting Eva despite the existing protective order that had been granted based on domestic violence against Mother.

20

Mother stopped attending therapy from October 2024 through April of 2025 and, according to her therapist, did not sufficiently develop her relapse prevention plan. After Mother's positive hair follicle tests in late 2024, Mother did not complete another OSAR, testifying that it was because she never received a call to schedule it; she later reached out to the Department and learned it was because they had an old phone number on file for her. In February 2025, Mother moved into an apartment with her fiancé, who is also on the lease. The Department had concerns about the fiancé based on his criminal history and the fact that he would not participate in drug testing.

Viewing the above evidence in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Mother's parental rights was in the best interest of the child. Accordingly, the evidence is legally sufficient to support the best-interest finding. Similarly, we are unable to say that the evidence contrary to the finding is "so significant that the factfinder could not have formed a firm belief or conviction" that termination of Mother's parental rights was in the best interest of the child. Consequently, the evidence is also factually sufficient to support the finding. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31. We overrule Mother's third issue.

## CONCLUSION

We affirm the trial court's order of termination.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed:  February 5, 2026